UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SHIRLEY A. GRAHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-CV-0144-CVE-TLW |
| | ) | |
| HARTFORD LIFE & ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Shirley Graham filed the instant civil action seeking to recover benefits and enforce

her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq.

(ERISA).   Plaintiff challenges as arbitrary and capricious the decision of Hartford Life & Accident

Insurance Company to deny her long-term disability (LTD) benefits.

### I.

Plaintiff was employed by the United States Postal Service (USPS) from November 1976

to July 2000.  From November 1976 until June 4, 1997, Graham was a rural letter carrier.  On June

4, 1997, the USPS offered her a position as a Modified Rural Carrier, a sedentary job designed

specifically to accommodate her physical condition.  Administrative Record (Admin. Rec.) at Hart2-

Grahm 196 (subsequent references omit the Bates-stamp prefix).  Plaintiff was a member of the

National Rural Letter Carrier's Association (NRLCA), the official bargaining representative for rural

letter carriers employed by the USPS.  The NRLCA, in order to provide benefits to members,

obtained a group long-term disability policy from Hartford (the Policy).   Plaintiff became a

participant in the NRCLA Group Benefits Plan (the Plan), which was funded by the Policy.  Id. at

566.  The Plan is governed by ERISA.  Dkt. # 21.

According to the Policy, benefits are payable if:

(1) you become Totally Disabled while insured under this plan;
(2) you are Totally Disabled throughout the Elimination Period;[1]
(3) you remain Totally Disabled beyond the Elimination Period;
(4) you are, and have been during the Elimination Period, under the Regular Care of a Physician; and
(5) you submit proof of loss satisfactory to The Hartford.

Admin. Rec. at 428.  Total Disability under the Plan means that:

1.during the Elimination Period; and
2. for the next 24 month(s), you are prevented by:
   a) accidental bodily injury;
   b) sickness;
   c) mental illness;
   d) substance abuse; or
   e) pregnancy,

from performing the Essential Duties of Your Occupation, and as a result you are earning less than 20% of your Pre-disability Earnings . . . .”

Id. at 116.

The Policy contains several provisions granting Hartford the discretionary authority to interpret the Policy language and determine eligibility.  Id. at 432 (“The Hartford reserves the right to determine if your proof of loss is satisfactory.”).  See also id. at 433 (“The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.”).

**A.    Plaintiff's Medical History**

---

[1]    Under the Plan, the Elimination Period is defined as “the period of time you must be Totally Disabled before benefits become payable.”  Admin. Rec. at 102.  The Elimination Period may be satisfied by one of the following: “Option 1: the first 60 consecutive day(s) of any one period of Total Disability. . . or Option 2: the first 90 consecutive day(s) of any one period of Total Disability.”  Id.  In this case, the parties do not dispute that Graham's Elimination Period started on July 16, 2000 and lasted until October 14, 2000.  See Dkt. ## 76, at 15; 77, at 10.

2

Plaintiff attributes her underlying injury to an on-the job accident that occurred on February 7, 1994, when she twisted her right knee while trying to get away from a dog.[2]  Graham reported that she re-injured her knee on March 8, 1994.  Id. at 227.  Graham received treatment for her injuries from Dr. T. Jeffrey Emel, M.D., and Dr. Bradford L. Boone, M.D., both of the Eastern Oklahoma Orthopedic Center.  Id. at 221.  Since her initial injury, plaintiff has experienced multiple complications with her knees and ankles.  On July 11, 1994, Graham underwent an arthroscopy and a partial synovectomy of her knee.  Graham's symptoms persisted post-surgery, and on March 4, 1997, she underwent a diagnostic arthroscopy, which indicated loss of joint surface "consistent with early mild to moderate medial compartment and patellofemoral arthrosis."  Id. at 227.  On April 18, 1997, an unsigned medical report from the Eastern Oklahoma Orthopedic Center states that Graham was "safe to return to office sedentary work endeavors."[3]  Id. at 226.

On October 25, 1998, Graham reported that she stepped off of a chair and twisted her left foot and ankle.  Id. at 229.  Graham returned to Dr. Emel for treatment and was diagnosed with a Grade 1+ deltoid sprain with lateral ankle sprain.  Id. at 230.  By November 25, 1998, Dr. Emel reported that Graham's ankle had improved.  Id. at 232.

On March 31, 1999, Dr. Emel's progress notes state that Graham's knee was "still symptomatic" and she would not be able to "change jobs or do any prolonged standing."  Id. at 233. On May 14, 1999, Graham received an injection of Kenalog, Decadron, and Marcaine in her knee.

---

[2]     The denial letter from Hartford details other injuries and medical conditions beginning in 1990.  Id. at 1-9.  These conditions include plantar fasciitis in 1990, and a meniscal injury in 1993.  Id. at 3.

[3]     Shortly thereafter, on June 4, 1997, plaintiff was accommodated with the sedentary position of Modified Rural Carrier.  Id. at 196.

Id. at 234.  On August 9, 1999, Graham returned to the Eastern Oklahoma Orthopedic Center complaining of pain in her left ankle.  Id. at 235.  She was given an ankle brace, anti-inflammatory medication, and a recommendation for physical therapy.  Id.  On September 2, 1999, Dr. Emel stated that Graham was "improved."  Id. at 236.  On November 16, November 30, December 7, and December 14, 1999, Graham was given injections of corticosteroids and Synvisc in her right knee. Id. at 238-40.  On January 11, 2000, Dr. Emel reported that Graham had "no swelling and the knee pain is significantly decreased."  Id. at 242.  However, Dr. Emel noted that Graham was having pain in her left ankle and ordered an MRI.  Id. at 243.  He also stated that she was "still continuing on her present work limitations of mostly sedentary work."  Id.  at 242.

On January 13, 2000, Graham had an MRI of her ankle, which revealed the presence of a ganglion cyst.  Id. at 244.  Graham went for a consultation on February 1, 2000 with Alan G. Lewis, M.D., who told her that surgical removal of the ganglion cyst might not relieve her ankle pain, but an excisional biopsy could be performed.  Id. at 249.  Despite her condition, Dr. Lewis stated that, from his perspective, Graham was fit to continue working until the surgery, and would be able to return to work several weeks after the procedure.  Id.

Graham underwent surgery on her ankle on February 23, 2000.  Id. at 253-54.  On March 2, 2000, Graham returned to Dr. Lewis and was told that she should start on a rehabilitative exercise program.  Id. at 258.  Dr. Lewis' March 21, 2000 report states that Graham was "overall doing significantly better in terms of her former discomfort."  Id. at 260.

4

The record does not include any medical reports for the time period between March 21, 2000 and July 28, 2000.[4]  However, July 15, 2000[5] was Graham's last day of work at the USPS.  Plaintiff alleges that her condition deteriorated due to the development of osteoarthritis in both knees and both ankles, forcing her to stop working.  Dr. Emel's progress notes from July 28, 2000 reflect that Graham had swelling in her ankle, and he reported giving her an injection of Celestone.  Id. at 263. On August 10, 2000, Dr. Emel noted that Graham's ankle and knee were both "improved."  Id.  at 264-65.  Graham received another series of Synvisc injections in her knee on August 30, September 7, and September 15, 2000.  Id. at 266-68.  On October 13, 2000, Dr. Emel noted that Graham was "only minimally improved."  Id. at 269.  Approximately one month later, on November 10, 2000, Dr. Emel reported that Graham's condition was the same as it was in October, and she continued to have knee pain despite the Synvisc injections.  Id. at 270.  He stated that "she [was] still not ready to return to work yet."  Id.  On November 15, 2000, Dr. Emel noted that Graham's knee and ankle were "acting up," but the "joint actually looks pretty good."  Id. at 271.  During the November 15, 2000 visit, Dr. Emel gave Graham an injection of Celestone and Decadaron in her left ankle.  Id. On December 5, 2000, Dr. Emel reported that Graham got relief from knee pain, but continued to have ankle pain and was "still not in a position where she can work."  Id. at 272.  On December 12, 2000, Dr. Emel stated that Graham's right knee was still problematic, but it "calmed down" enough to forego an injection.  Id. at 273.  Nonetheless, Dr. Emel concluded that Graham was "still temporarily totally disabled."  Id.

---

[4]    It is unclear what happened in that time period to cause Graham's deterioration to the point where she could no longer work.

[5]    July 15, 2000 was the last day Graham worked at the USPS; July 17, 2000 was the first day of Graham's leave of absence.  Id. at 566.

**B.**     **Graham's Claims for Benefits**

When Graham stopped working on July 15, 2000, she was working as a Modified Rural Carrier.  The Modified Rural Carrier position is described as follows: "General clerical work for Maintenance Department.  Simple filing, answering phones, occasional simple computer use, completion of reports, and other duties as assigned within documented restrictions." Id. at 450.  In addition, the job had the following physical requirements: "2 hours each intermittent walk/stand. 1 hour intermittent lift up to 10 lbs.  No climb, kneel, twist.  Minimal intermittent bend/squat.  No push/pull.  Sedentary work." Id. at 450.  Graham described her job duties for the time she worked in her modified position as being "limited to office work." Id. at 577.  Hartford determined that, at the time Graham stopped working, she had been employed as a Modified Rural Carrier for more than six months and, accordingly, it would be considered her occupation for the purpose of determining eligibility for LTD benefits. Id. at 1.

On July 25, 2000, Graham applied for disability retirement. Id. at 575.  In a July 26, 2000 letter from Dr. Emel to the United States Department of Labor, he reported that "Mrs. Graham has significant osteoarthritis involving both knees and both ankles. Id. at 261-62.  An ambulatory job would be counterproductive for her. . . . I really do not think she will be able to continue her work capacities and recommend that you consider her for Disability retirement." Id.  On December 1, 2000, the United States Office of Personnel Management notified plaintiff that she had been approved for disability retirement. Id. at 557-58.

Plaintiff filed an application for LTD benefits on October 27, 2000. Id. at 577-79.  Upon receipt of plaintiff's application, Hartford assigned a claims specialist who reviewed submitted documents, interviewed Graham, and solicited additional materials from plaintiff, Dr. Emel, and her

6

employer.  Dr. Emel was asked to complete a Physical Capabilities Evaluation Form.  On the form, which was completed on December 15, 2000, Dr. Emel indicated that Graham was capable of sitting for two hours and driving for one hour, for a total of three hours of work per day.  Id. at 531.  On December 19, 2000, Twila Nolan, a Human Resources Specialist for the USPS, completed a Physical Demands Analysis Form, and concluded that Graham was capable of sitting for eight hours and intermittently standing or walking with rest.  Id. at 537.  On December 28, 2000, Dr. Emel completed another Physical Capabilities Evaluation Form, and concluded that Graham was capable of sitting for one hour at a time, for a total of four hours per work day.  Id. at 514.

The Hartford claims specialist contacted Dr. Emel to have him clarify whether plaintiff's condition affected her ability to sit and perform a sedentary job.  On January 23, 2001, Dr. Emel responded "no, it does not but [the patient] has retired."  Id. at. 479-80.  Based on this information, Hartford denied Graham's claim in a letter dated February 28, 2001.  Id. at 16-19.  Plaintiff appealed the denial through the administrative appeal process.  Id. at 447.  As part of the appeal, Hartford again contacted Dr. Emel, who opined that Graham could not sit for more than one hour at a time.  Id. at 448.  Hartford denied her appeal on August 3, 2001, stating that the Modified Rural Carrier position allowed her to move around as needed and, accordingly, Graham's physical restrictions would not prevent her from performing the essential requirements of her occupation.  Id. at 442-44.  On September 26, 2001, Graham appealed again, reiterating her belief that Hartford failed to consider all of the facts in support of her claim, and claiming that her severe pain and trouble sleeping contributed to her inability to work.  Id. at 439-40.  Hartford again denied her appeal, finding that Graham provided no medical evidence of a sleep disorder and that none of the medical records with respect to her knees and ankles documented the severity of her pain.  Id. at 388-90.

7

Finally, Graham appealed on February 21, 2003, and that appeal was denied on the grounds that the record was closed and the appeals process exhausted. Id. at 350.

On February 27, 2003, plaintiff filed a complaint alleging a state law claim for breach of duty of good faith and fair dealing. Dkt. # 1. On April 22, 2005, another judge of this Court ruled that the Plan is governed by ERISA, thus preempting plaintiff's state law claim. Dkt. # 21. Thereafter, plaintiff "proceeded under ERISA jurisprudence" and on January 20, 2006, this Court remanded plaintiff's claim for benefits to Hartford for a full and fair redetermination of the claim and closed the case. Dkt. # 33.

On remand, Hartford retained Steven A. Silver, M.D., a board-certified orthopedic surgeon, to examine Graham's medical records. Admin. Rec. at 170-74. Specifically, Dr. Silver was asked to "define the functional limitations for the period of 7/16/00 through and beyond 10/14/00 [the Elimination Period] and at what level." Id. at 170. Dr. Silver reviewed Graham's medical records and spoke with Dr. Emel regarding Graham's condition. Id. On July 3, 2008, Dr. Emel reportedly told Dr. Silver that Graham was able to "sit for an unlimited period of time, but can stand for no more than approximately 15 minutes and walk for no more than 15 minutes. He feels that she can lift no more than 10 lbs. due to a problem with respect to her back." Id. Thereafter, Dr. Silver provided Hartford with a report in which he opined as follows:

> It is my opinion that based on the information provided that Shirley Graham is capable of sedentary level activity from 7-16-00 to 10-14-00 where she can sit for unlimited periods of time and lift up to 10 lbs. It is my opinion that she can perform some form of ambulation around her office for approximately 15 to 20 minutes as noted by Dr. Emel. She can engaged in fine manipulation with respect to her hands. In summary, it is my opinion that both the information provided as well as conversation with Dr. Emel bear out this woman having a capacity for sedentary work from 7-16-00 to 10-14-00 and beyond.

Id. at 174.

Hartford contacted Dr. Silver and asked him to clarify several items in his report. Id. at 159-60. Dr. Silver was asked whether he had advised Dr. Emel that Hartford was "looking specifically at the period 7/16/00 through 10/14/00 and beyond." Id. Dr. Silver was also asked to clarify whether Dr. Emel understood the relevant time period with respect to whether Graham could sit most of the time in an eight hour day. Id. According to Dr. Silver, he called Dr. Emel for clarification on July 22, 2008, and, with respect to both questions, Dr. Emel stated that Graham was "50 lbs. heavier at that time," but "the restrictions would probably be the same." Id. at 162. Hartford also requested clarification on whether Dr. Emel conveyed that Graham could stand and walk 15 minutes total in an eight hour day or whether she could stand and walk 15 minutes at a time in the course of an eight hour day. Id. Silver responded that "Dr. Emel feels the claimant can sit for 8 hours a day and stand/walk 15-30 minutes 3 to 4 times daily but not an [sic] a frequent basis." Id.

Hartford denied plaintiff's remanded claim for benefits on July 24, 2008. Id. at 1-9. In its denial letter, Hartford stated that it reviewed all of the evidence and determined that Graham was "functionally capable of performing the duties of her sedentary occupation" for the Elimination Period of July 16, 2000 through October 14, 2000. Id. Plaintiff filed an amended complaint in this Court on August 4, 2008 (Dkt. # 59).

**II.**

**A.    Standard of Review**

Plan beneficiaries, like plaintiff, have the right to federal court review of benefit denials and terminations under ERISA. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). Specifically, 29 U.S.C. § 1132(a)(1)(B) grants plaintiff the right "to recover benefits due

9

to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." The default standard of review is <u>de novo</u>. However, when a plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a challenge under § 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard. <u>See</u> <u>Firestone</u>, 489 U.S. at 115 (applying a deferential standard of review when the plan administrator or fiduciary has discretionary authority to determine eligibility for benefits or to construe the terms of a plan). It is clear in this case that Hartford had the authority to determine eligibility for benefits and to construe the terms of the Plan. <u>See</u> Admin. Rec. at 105, 112-13, 432-33. Accordingly, Hartford's decision will be reviewed using the arbitrary and capricious standard.

Under the "pure" version of the arbitrary and capricious standard, a plan administrator's or fiduciary's decision will be upheld "so long as it is predicated on a reasoned basis." <u>Adamson v. Unum Life Ins. Co. of Am.</u>, 455 F.3d 1209, 1212 (10th Cir. 2006). That basis "need not be the only logical one nor even the best one." <u>Nance v. Sun Life Assur. Co. of Can.</u>, 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting <u>Kimber v. Thiokol Corp.</u>, 196 F.3d 1092, 1098 (10th Cir. 1999)). The decision merely must "reside[ ] 'somewhere on a continuum of reasonableness-even if on the low end.'" <u>Adamson</u>, 455 F.3d at 1212 (quoting <u>Kimber</u>, 196 F.3d at 1098). A plan's decision will not be set aside "if it was based on a reasonable interpretation of the plan's terms and was made in good faith." <u>Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm.</u>, 203 F.3d 733, 736 (10th Cir. 2000).

In contrast, "[i]ndicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by a fiduciary." <u>Caldwell v. Life Ins. Co. of N. Am.</u>, 287 F.3d 1276, 1282 (10th Cir. 2002). The Tenth Circuit has held that "[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion

reached by the [decisionmaker].  Substantial evidence requires "more than a scintilla but less than a preponderance."  Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citation omitted).  In reviewing the plan administrator's or fiduciary's decision, the reviewing court generally is "limited to the administrative record-the materials compiled by the [decisionmaker] in the course of making [the] decision."  Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002) (citation omitted).  The reviewing court should give less deference to a decision if the plan administrator or fiduciary fails to gather or to examine relevant evidence.  Caldwell, 287 F.3d at 1282.

**B.      Conflict of Interest and <u>Glenn</u>**

If an ERISA fiduciary both decides eligibility and pays benefits claims out of its own pocket, a conflict of interest arises.  Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1005 (10th Cir. 2004); see also Pitman v. Blue Cross Blue Shield of Okla., 217 F.3d 1291, 1296 n. 4 (10th Cir. 2000) ("[I]n Blue Cross' situation, as both insurer and administrator of the plan, there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound.").  Under the "sliding scale" approach crafted by the Tenth Circuit, "the reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given" to benefits decision "in proportion to the seriousness of the conflict."  Fought, 379 F.3d at 1004.  The claimant has the burden of proving that "the plan administrator's dual role jeopardized his impartiality."  Id. at 1005 (citation omitted).  Where there is an inherent conflict of interest, Fought requires a district court to shift the burden to the plan administrator to prove that its decision is supported by substantial evidence.  Id. at 1006.  However, the United States Supreme Court in Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008), held that an employer's or insurer's dual-role conflict is simply "a factor in determining whether the plan administrator has abused its

11

discretion in denying benefits; . . . the significance of the factor will depend upon the circumstances of the particular case." Id. at 2346.

It is undisputed that Hartford has an inherent conflict of interest as both the payor and claims administrator of the Plan. Plaintiff argues that Glenn "significantly changes the way the Court should review denial of benefits under ERISA jurisprudence." Dkt. # 76, at 18. However, the Supreme Court was clear that it was not altering the standard of review from deferential to de novo in cases involving an inherent conflict of interest. Glenn, 128 S.Ct. at 2350. Rather, Glenn strongly suggests that the key inquiry for a court is whether an insurer's conflict of interest resulted in a biased decision on the plaintiff's benefits claim. Id. at 2350-51. In this respect, Glenn is consistent with prior Tenth Circuit precedent. See Fought, 379 F.3d at 1005 ("Evidence of a conflict of interest requires proof that the plan administrator's dual role jeopardized his impartiality."). The Tenth Circuit has suggested that Glenn does not overrule any previous decisions by the Tenth Circuit, because the existence of a conflict of interest was always a factor when determining the level of deference. See Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010-11 (10th Cir. 2008). However, Weber acknowledged a "dial back" of deference in cases such as this one, when the plan administrator and insurer have an inherent conflict of interest. Id. at 1010. The court in Weber stated that it would "still employ the arbitrary and capricious standard, but [would] weigh [the plan administrator's] conflict as a factor in determining the lawfulness of the benefits denial." Weber, 541 F.3d at 1011. Under Fought, when a plan administrator and insurer operate under an inherent conflict of interest:

> the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

Fought, 379 F.3d at 1006. This type of automatic burden-shifting is inconsistent with Glenn's directive to consider an inherent conflict as simply a factor in the Court's analysis.[6] In Weber, GE Group Life Assurance Company was the plan administrator and insurer, and the Tenth Circuit did not shift the burden to the plan administrator to establish the reasonableness of its decision. The Tenth Circuit identified the plan administrator's inherent conflict of interest as a factor, but it did not specify how much the level of deference should be reduced. Weber, 541 F.3d at 1011. Thus, in order to comply with Glenn and ensure consistency with prior, binding Tenth Circuit precedent, the Court will deem Hartford's inherent conflict of interest a factor in its decision and consider the other factors identified by the parties to determine by how much the Court's deference to Hartford's determination should be reduced.

While the Court must not ignore Hartford's dual-role conflict, the fact that Hartford has a financial interest in the outcome does not automatically create an inference that Hartford is biased. See Finley v. Hewlett Packard Co. Employee Benefits Org. Income Protection Plan, 379 F.3d 1168, 1176 (10th Cir. 2004) (refusing to infer that a general motivation to deny claims for the purpose of saving money suggests that an inherently conflicted plan administrator was biased). The Court will consider Hartford's inherent conflict of interest as a factor and "dial back" any deference. However,

---

[6]     In fact, the Glenn Court specifically stated:  "Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account." 128 S.Ct. at 2351.

the Court will not shift the burden to Hartford to prove the reasonableness of its decision based only an inherent conflict of interest.  Graham has presented no evidence that Hartford's inherent conflict of interest resulted in a biased decision, nor does anything in the Administrative Record reflect any evidence of bias.  Although Graham may dispute Hartford's decision to deny her claim, this alone does not show that Hartford acted in a biased manner or that Hartford's dual-role conflict of interest tainted its decision.  In this Court's previous Opinion and Order, the Court held that defendant failed to establish by substantial evidence that its denial of benefits was reasonable.  Dkt. # 33, at 7.  However, in light of the Supreme Court's holding in <u>Glenn</u> and subsequent Tenth Circuit precedent, the Court will not shift the burden to defendant and instead will determine whether the denial of benefits was "arbitrary and capricious."

### III.

Graham contends that Hartford's decision to deny her LTD benefits was arbitrary and capricious.[7]  Graham argues generally that her case is stronger now after remand because of new evidence in record.[8]  Graham offers numerous reasons why Hartford's denial was not supported by even a scintilla of evidence, including: Hartford gave undue weight to evidence favoring denial; Hartford improperly based its denial of benefits on the fact that Graham received an accommodation at work; the treating physician's opinions should have been controlling; and Hartford should have

---

[7]     Graham submits that <u>Glenn</u> has changed the standard of review in ERISA cases, but even if the Court uses the arbitrary and capricious standard, plaintiff is still entitled to benefits.  As discussed above, the denial of benefits will be reviewed under the arbitrary and capricious standard.

[8]     The new evidence in the record consists of Dr. Emel's letter dated August 1, 2002 (Admin. Rec. at 354), the Agency Certification form (<u>id.</u> at 355), and Dr. Silver's report (<u>id.</u> at 170-74).  Plaintiff argues that the letter and the form strongly weigh in favor of a grant of LTD benefits.

given more weight to the Civil Service Administration's grant of disability retirement.  In contrast, Hartford argues that its decision denying LTD benefits is supported by substantial evidence in the record, and was not arbitrary or capricious.

**A.      Undue Weight to Evidence Favoring Denial**

Plaintiff renews her argument that Hartford gave undue weight to Dr. Emel's January 23, 2001 statement to the exclusion of the other medical evidence in the record.  Hartford argues that it gathered all available medical evidence and other information related to Graham's claim, and based on all of the evidence, determined that Graham was "not prevented by injury, illness or disease from performing the essential duties of her own occupation."  Dkt. # 77, at 15.  The Court previously agreed with plaintiff that Hartford's decision gave undue weight to one statement from Graham's treating physician to the exclusion of other evidence in the record.  However, after remand for a full and fair determination of Graham's claim, the Court finds that Hartford weighed all available evidence in reaching its decision.   In its initial four-page denial letter, the plan administrator relied heavily on Dr. Emel's January 23, 2001 statement, and did not clearly indicate that it reviewed all of Graham's medical records.  In contrast, Hartford's post-remand, nine-page denial letter includes a recitation of all of the evidence reviewed, and does not explicitly base its denial on any one statement to the exclusion of other medical evidence in the record.  Accordingly, defendant did not give undue weight to evidence favoring denial.

**B.      Graham's Accommodation at Work**

Graham also renews her argument that Hartford denied her claims because she received an accommodation at work.  Hartford contends that Graham's accommodation was not the basis for the denial.  Rather, Hartford considered Graham's sedentary position at the time she filed her claim in determining whether she would be able to perform the essential requirements of her occupation.  At

the time Graham stopped working, she had been performing her modified job for over three years; accordingly, Hartford determined that Graham's occupation was "Modified Rural Carrier." Because Hartford had the discretion to interpret the terms and conditions of the Policy, it was entitled to determine that Graham's occupation was the one she had been in for more than six months before she stopped working. <u>See</u> Admin. Rec. at 1. Thus, it is clear from the record that Graham's accommodation was relevant to the extent that it determined her occupation at the time she stopped working; there is nothing to suggest that Hartford used her accommodation as part of its decision to deny benefits.

**C.    Medical Opinions**

Plaintiff argues that Dr. Emel clearly opined that Graham was disabled, and Hartford arbitrarily refused to credit his opinion as reliable evidence supporting an award of benefits. Dkt. # 76, at 14. Hartford argues that while it considered Dr. Emel's opinions, it was not required to "accord special deference to the opinions of treating physicians." <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 831 (2003). Further, a non-treating physician's opinion may be treated as reliable evidence, despite conflicting with a treating physician's assessment. <u>Gannon v. Metropolitan Life Ins. Co.</u>, 360 F.3d 211, 214 (1st Cir. 2004).

To reach its decision, Hartford gathered evidence concerning Graham's medical conditions and obtained the opinions of her treating physician, Dr. Emel, and Dr. Silver, a board-certified orthopedic surgeon. Dr. Silver reviewed Graham's file and consulted with Dr. Emel. At the conclusion of his investigation, Dr. Silver wrote a thorough report in which he summarized Graham's medical records and concluded that, in his professional opinion, Graham was capable of sedentary work during the Elimination Period. Although Dr. Silver's report favored denial of benefits, Hartford nonetheless asked him to have an additional conversation with Dr. Emel to clarify

several points.  Specifically, Hartford was concerned that Dr. Emel did not understand that Dr. Silver

had asked him to opine on Graham's condition during the Elimination Period.  After an additional

conversation with Dr. Emel, Dr. Silver reported that Dr. Emel stated that the work restrictions for

Graham would be "the same."[9]  The record shows that Dr. Silver reached his opinion on the basis

of the available medical evidence, and Graham points to nothing in the record indicating that Dr.

Silver's opinion was unreliable.  Under the circumstances here, it was reasonable for Hartford to

credit Dr. Silver's review of the medical records.  See Davis v. Unum Life Ins. Co. Of Am., 444

F.3d 569, 577 (7th Cir. 2006) (noting that it is common and reasonable for doctors to review medical

records and reach a professional opinion on the basis of a paper review).  Because Hartford may rely

on the opinion of a non-treating physician, even if it conflicts with the treating physician's

assessment, the Court finds that Hartford reasonably relied on Dr. Silver's report when reaching its

decision.

Indeed, Hartford's reliance on Dr. Silver's report was all the more reasonable given that it

is not entirely clear that Dr. Silver's and Dr. Emel's opinions conflict.  A thorough review of Dr.

Emel's reports and letters shows that his conclusions are reasonably open to interpretation.  First,

it does not appear that Dr. Emel was fully aware of the physical requirements of Graham's modified

---

[9]  Plaintiff argues, and the Court agrees, that this statement fails to clarify Dr. Emel's position
with respect to Graham's condition during the Elimination Period.  Accordingly, Hartford
should not have relied on Dr. Emel's 2008 statements to the extent that they were unclear.
Plaintiff further argues that Dr. Silver's representation of Dr. Emel's 2008 statements is not
as reliable as Dr. Emel's contemporaneous opinions as reflected in his records and letters.
However, as discussed below, Dr. Emel's medical opinions are reasonably subject to
interpretation.  The Court finds that Hartford did not give undue weight to Dr. Silver's report
of Dr. Emel's opinion, but rather reviewed all of the medical records available.

position when he concluded that Graham was unable to work.[10]  For example, on March 31, 1999, Dr. Emel wrote a letter to the United States Department of Labor stating that Graham would be unable to return to her position as a rural carrier because she could not "tolerate sorting her mail." Admin. Rec. at 233.  In another letter to the Department of Labor, dated July 26, 2000, Dr. Emel recognized that Graham was working in a "special duty" position, but nonetheless stated that an "ambulatory job would be counterproductive" for her.  Id. at 261-62.  By the time these letters were written, Graham had been working in a modified position that did not require her to sort her mail or perform an ambulatory job.

Further, plaintiff relies on Dr. Emel's July 26, 2000 letter for his statement that  he "really does not think [Graham] will be able to continue her work capacities."  Id. at 262.  However, Dr. Emel's statement is not as strong as plaintiff argues.  In the letter, Dr. Emel seems to suggest that Graham will not be capable of continuing to work.  He does not state that, at the time the letter was written, that Graham was currently incapacitated or in such severe pain that she was totally incapable of performing a sedentary job.  In addition, although the Court previously held that Hartford gave undue weight to Dr. Emel's January 23, 2001 statement that Graham's condition would not prevent her from sitting, the statement need not be completely ignored on remand.  When considered along with other evidence in the record, this statement suggests that Dr. Emel did not have a strong position with regard to whether Graham could perform sedentary work.  While it is not determinative in and of itself, the January 2001 statement favors Hartford's decision to deny LTD benefits.

------

[10]     The Court also notes that Dr. Emel's progress notes during the Elimination Period vary between concluding that Graham was showing improvement and noting that her condition was unchanged.   Nonetheless, Dr. Emel concluded in his letters that Graham was "temporarily totally disabled."

Finally, plaintiff relies heavily on Dr. Emel's August 1, 2002 letter, and argues that he unequivocally concluded that Graham was disabled and entitled to benefits. Id. at 354.  However, the letter does not specifically reference the Elimination Period, nor does Dr. Emel explain the basis for his opinion.  In the letter, Dr. Emel concludes that "there is no gainful employment for [Graham] to do at the post office."  Id.  However, he does not explain her physical limitations in terms of the number of hours Graham was capable of sitting, walking, or standing.  Accordingly, Dr. Emel's August 2002 letter, when read in conjunction with other evidence in the record, is not determinative.  Thus, Hartford was not arbitrary or capricious in failing to give this letter significant weight in reaching a decision.

In sum, it was reasonable for Hartford to rely on Dr. Silver's opinion that Graham was capable of performing the essential requirements of her sedentary job during the Elimination Period, even if that opinion was in conflict with the treating physician's opinion.  In fact, it is not entirely clear that Dr. Emel ever conclusively opined that Graham was specifically incapable of performing the essential duties of her sedentary occupation.  Therefore, Dr. Silver's opinion does not necessarily conflict with that of plaintiff's treating physician.  In any event, a review of the record shows that the evidence supporting denial was substantial, and Hartford was not arbitrary and capricious in its decision.

**D.**     **Hartford's Consideration of Graham's Disability Retirement**

Plaintiff further argues that Hartford should have given more weight, in reaching its decision, to the Civil Service Administration's determination that Graham was entitled to disability retirement.  Plaintiff cites to the Agency Certification of Reassignment and Accommodation Efforts form, where the individual reviewing Graham's application for disability retirement checked the box that no accommodation was possible because of the severity of the claimant's medical condition.

The reviewer further noted that "Ms. Graham has been given a limited duty job, but is unable to perform the duties of this job due to severity of her disabilities.  She is currently on LWOP." Admin. Rec. at 355.  Hartford argues that the plan administrator is not required to follow an agency's disability decision because the procedures used to determine disability may differ from the procedures under the Policy.  While Hartford's denial letter does not specify how the plan administrator weighed the Civil Service Administration determination, it was nonetheless reasonable for Hartford to decide that this evidence was not determinative.  The Administrative Record does not include the entire certification form, and the one page that is provided gives no insight into the agency's procedures or which records were reviewed.  See id. at 355.  Similarly, the letter from the Office of Personnel Management does not explain the basis for the agency's decision.  See id. at 557.  The Court finds that it was not arbitrary and capricious for the plan administrator to consider Graham's entitlement to disability retirement but ultimately conclude that it was not determinative.

## IV.

After reviewing the record, and considering the evidence relied on by Hartford to make its determination, the Court finds that Hartford's decision to terminate LTD benefits was predicated on a reasoned basis and supported by substantial evidence.  While there is evidence in the record that would support a disability claim, the question for the Court on review is the reasonableness of Hartford's decision to deny Graham's LTD benefits.  The Court finds that Hartford's decision was not arbitrary and capricious and, therefore, the decision of the plan administrator should be affirmed.

**IT IS THEREFORE ORDERED** that defendant's July 24, 2008 final decision to deny

plaintiff's LTD benefits is hereby **affirmed**.  A separate judgment is filed herewith.

**DATED** this 13th day of March, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

21